(Decided 25th March, 1891.)

---

THE BALTIMORE AND DRUM POINT RAILROAD COMPANY *vs.* NATHAN PUMPHREY, THOMAS PUMPHREY, and others.

*Jurisdiction in Equity—Rights of Tax-payers—Construction of section 54 of Article 3 of the Constitution—Acts of 1872, ch. 245, and 1874, ch. 225—Calendar month—Publication of Notice—Conditional subscription by County Commissioners to the Stock of a Railroad company—Exhaustion of Power of Subscription—Acceptance of Contract—Release of Subscription—Practice in Court of Appeals.*

The tax-payers of a county may maintain a bill in equity impeaching the validity and continued operation of proceedings and resolutions of the board of County Commissioners taken professedly under Acts of Assembly authorizing a subscription by said board to the capital stock of a railroad company.

Section 54 of Article 3 of the Constitution provides that "no county of this State shall contract any debt, or obligation, in the construction of any railroad, canal, or other work of internal improvement, nor give, or loan its credit to, or in aid of any association, or corporation, unless authorized by an Act of the General Assembly, which shall be published for two months before the next election for members of the House of Delegates in the newspapers published in such county," &c.   The Act of 1872, ch. 245, authorized the County Commissioners of Anne Arundel County, in the name of and for said county, to subscribe for a

Baltimore and Drum Point R. R. Co. *vs.* Pumphrey, *et al.*

prescribed amount of shares of the capital stock of the Baltimore and Drum Point R. R. Co., and to issue coupon bonds for the purpose of meeting said subscription, and provided that such bonds should be received at their par value by the railroad company in payment of the shares of stock so subscribed for, their delivery to be made in instalments dependent on the progress of the work. By sec. 12 of the Act it was directed that the question of the approval or disapproval of the Act should be submitted to the legally qualified voters of the county at an election to be held on the fourth Monday of April then next. This Act was approved by the Governor on the 1st day of April, 1872, and the election at which it received the approval of the voters of the county was held on the fourth Monday of April, 1872. The said Act was published in the two county papers before the next election for members of the House of Delegates, the first publication having been made in one of said papers on the 6th of September, 1873, and in the other on the 9th of said month. The said election was held on the 4th of November, 1873. HELD:

1st. That the popular election required by said Act should have been held on the fourth Monday of April, 1873, and the election held on the fourth Monday of April, 1872, was a year in advance of the proper time.

2nd. That said Act was not duly published in the newspapers of the county "for two months before the next election for members of the House of Delegates."

3rd. That the object of said Act was a loan of the credit of the county, and within and subject to the constitutional restriction (Const., Art. 3, sec. 54.)

4th. That the said constitutional requirement as to publication, and the time for which such publication should be made, was mandatory and not merely directory.

5th. That the two months of publication were calendar and not lunar months.

6th. That the Act of 1874, ch. 225, confirmatory of the Act of 1872, ch. 245, was doubtlessly passed under the assumption that the popular election required by the Act of 1872 had been regularly held, and the conditions precedent to a valid confirmatory Act not having been in fact complied with, there was no legal or valid authority conferred and confirmed by said Acts of 1872 and 1874.

7th. That the County Commissioners having made a conditional subscription to the stock of the Baltimore and Drum Point Railroad Company the terms and conditions embodied in their resolution of subscription, (the same having been accepted by the railroad company,) formed parts of the contract between them ; and the railroad company could not in good faith raise the objection that none but an unconditional subscription was authorized by the Act of 1872.

8th. That although the Commissioners could add no condition to their subscription that was in conflict or inconsistent with the terms prescribed by the Act of the Legislature, there was nothing in the Act to negative their right to add such terms and conditions as would consist with the terms of the power, and were proper for the protection and security of the rights and interests of the community that they represented.

9th. That assuming that the Acts of 1872 and 1874 were free of all constitutional objection, the conditional subscription of the Commissioners was a valid contract, and as such exhausted the power of the Commissioners to make any further subscription.

10th. That when in 1880, before any of the more important conditions of the subscription had been complied with by the railroad company, the latter applied for and obtained an amendment of its charter (Act of 1880, ch. 200,) and accepted the same, extending the time for the completion of the road, with the condition that it should not in any way be so construed as to bind the county for its subscription, unless the County Commissioners should give their consent to the continuation thereof, the railroad company thereby in effect released the subscription.

11th. That the County Commissioners never having given their consent to a continuation of the original subscription as made, and having no power so to do, the power conferred having been exhausted, an attempt by them to make a new subscription on the 21st of January, 1890, on different and conflicting terms and conditions, was simply a nugatory act.

Where there has been no exception to the sufficiency of the averments of the bill, under section 34 of Article 5 of the Code, and proof has been introduced by agreement, without exception thereto, upon the ground that there was no corresponding allegation in the bill to which the proof could be applied, the Court of Appeals is required to decide the question raised by the proof.

Baltimore and Drum Point R. R. Co. *vs.* Pumphrey, *et al.*

APPEAL from the Circuit Court for Anne Arundel County, in Equity.

The case is stated in the opinion of the Court. Section 54 of Article 3 of the Constitution of Maryland referred to in the opinion provides that "No county of this State shall contract any debt or obligation in the construction of any railroad, canal, or other work of internal improvement, nor give or loan its credit to or in aid of any association or corporation, unless authorized by an Act of the General Assembly, which shall be published for two months before the next election for members of the House of Delegates, in the newspapers published in such county, and shall also be approved by a majority of all the members elected to each house of the General Assembly at its next session after said election."

The cause was argued before ALVEY, C. J., ROBINSON, IRVING, BRYAN, FOWLER, McSHERRY, and BRISCOE, J.

*John P. Poe,* and *George Hoadly,* for the appellant.

The Act of 1872, ch. 245, which authorized the subscription in dispute, was duly submitted to the people, and approved by them, and there were no irregularities of any kind in the notice of the election which it directed to be given, nor in the election held under its provisions, nor in the official certificate of the clerk of the Circuit Court, announcing its approval by a majority of the voters.

If any irregularities of any kind occurred, they were all cured by the passage of the ratifying and confirmatory Act of 1874, ch. 225.

Inasmuch as the bill contains no allegation that the Act of 1872, ch. 245, was not duly advertised in the newspapers published in Anne Arundel County for two months preceding the next election, viz., that of November, 1873, as provided in section 13 of the Act, the ques-

tion as to such advertisement does not arise, and is not properly presented upon this record.

If the Court will, however, consider this question, the publication in the newspapers for the two months of September and October, 1873, is fully and sufficiently proved, and is a complete compliance with the provisions of the 13th section of the Act. . Indeed, the advertisement was as full as the weekly issues of the newspapers then published in Anne Arundel County made possible. *Anderson's Dictionary of Law*, 686, *word "month."*

If such advertisement can be considered as not published for the full period of two months, treating the law as meaning calendar, and not lunar months, the provisions of the 13th section of the Act are directory merely, and the omission to publish for two full calendar months is not fatal, even although such advertisement was not strictly possible; but such error or omission was cured by the passage of the confirmatory Act of 1874, ch. 225. *Pierce on Railroads*, 102–3.

Section 54 of Article 3 of the Constitution, does not apply to the subscription in dispute, for the reason that the subscription is not a debt contracted by the county in the construction of a railroad, nor the gift or loan of its credit to, or in aid of, any corporation. *Mayor, &c., of Baltimore vs. Gill*, 31 *Md.*, 375; *Walker vs. City of Cincinnati, et al.*, 21. *Ohio St. Rep.*, 14.

If section 54, of Article 3 of the Constitution, does apply to the subscription in dispute, its provisions, so far as they relate to the advertisement for two months, are directory merely, and have been sufficiently complied with, as is *conclusively* established by the passage of the confirmatory Act of 1874, ch. 225, by the General Assembly, for whose information and guidance such publication is designed, as well as by the recitals in the subscriptions made by the County Commissioners. *Town of Coloma vs. Eaves*, 92 *U. S.*, 487–492; *Town of Venice vs.*

*Murdock*, 92 *U. S.*, 494; *Marcy vs. Township of Oswego*, 92 *U. S.*, 639; *Humboldt Township vs. Long, et al.*, 92 *U. S.*, 642.

The subscription of the 6th of June, 1876, was, and is, valid and enforceable. The super-addition of conditions outside and beyond the terms of the Act of 1872, ch. 245, does not invalidate it, as contended for by the appellees, but such unauthorized conditions are void and will be rejected, and the subscription stripped of them will stand and be upheld. *King's Co. Elevated R. R. Co's Case*, 105 *New York*, 97; *Joslyn vs. Dow*, 19 *Hun*, 494; *Com's of Knox Co. vs. Nichols*, 14 *Ohio St.*, 260; *Madison County Court vs. Richmond, &c., R. R.*, 80 *Kentucky*, 16; *Burroughs on Public Securities*, 236, 256, 258; *Ohio, Ex Rel. vs. Board of Education of Perrysburg*, 35 *Ohio St.*, 519; *De Groot vs. United States*, 5 *Wallace*, 430; 2 *Sugden on Powers*, 84, 277; *Barnum vs. Barnum*, 26 *Md.*, 173; *Mayor, &c. vs. Dechert*, 32 *Md.*, 384; *Chicago, B. & Q. R. R. Co. vs. City of Aurora*, 99 *Ill.*, 212; *Berry vs. Balt. & Drum Point Railroad Co.*, 41 *Md.*, 446; *Farwell on Powers*, 250.

The resolution of the County Commissioners of the 18th of April, 1878, repealing the subscription of the 6th of June, 1876, is wholly inoperative and void, because it was not competent for them to repeal it, without the consent of the company, which consent was never given.

The subscription of the 2nd of August, 1887, is of no consequence, and can have no effect upon the question at issue, for the simple and satisfactory reason that it was never accepted or acquiesced in by the appellant.

The resolution of the 21st of January, 1890, continuing the subscription of the 6th of June, 1876, is valid as a renewal of that subscription, but if not entitled to be thus treated, is at least to be treated and must have effect given to it as a release by the County Commis-

Baltimore and Drum Point R. R. Co. *vs.* Pumphrey, *et al.*

sioners, by and with the consent of the appellant, of the conditions imposed by the subscription of the 6th of June, 1876, outside of and beyond the terms of the Act of 1872, ch. 245. If for any reason the power to subscribe conferred by that Act, after it was exercised by the subscription of the 6th of June, 1876, is to be regarded as exhausted, so far as to disable the County Commissioners from making a new subscription, the County Commissioners could nevertheless validly waive and cancel conditions improperly exacted by them in excess of their authority, and release the appellant from such conditions; and the subscription of the 6th of June, 1876, thus stripped by the action of the County Commissioners ·on the 21st of January, 1890, of the unauthorized conditions annexed to it, can now be enforced as a subscription, conforming absolutely to the terms of the Act of 1872.

The right of the appellant to the subscription has not been lost or forfeited by lapse of time, change of circumstances and condition, construction of other roads in the county, nor by the delay of the appellant in completing its road. *High on Extraordinary Legal Remedies, sections* 24, 34, 46, 328; *Kelsey ·vs. King,* 32 *Barb.,* 416; *Gibson vs. C. & N. R. T. & B. Co.,* 18 *Ohio St.,* 396.

The execution by the appellant of the deed of trust of February 1st, 1888, to the Mercantile Trust and Deposit Company, to secure its first mortgage bonds, amounting to $1,500,000, does not in any manner or degree affect the liability of the County Commissioners to pay their subscription.

*John F. Williams, Isidor Rayner,* and * *Frank. H. Stockett,* for the appellees.

The County Commissioners of Anne Arundel County have not now, and never had, any power of themselves to

* Present, but did not take part in the argument.

make any subscription whatever to the capital stock of the Baltimore and Drum Point Railroad Company. The power conferred upon a municipal corporation or County Board to impose such a burden upon tax-payers, in aid of a railroad company, is in derogation of the common law, and when granted, must not only be clearly conferred, but strictly pursued, and every step required by the statute and the Constitution must be shown to have been taken in conformity therewith. This Court, in the case of the *Mayor and City Council of Baltimore vs. Gill, et al.*, 31 *Md.*, 395, said: "In this State, the Courts have always maintained with jealous vigilance the restraints and limitations imposed by law upon the exercise of power by municipal and other corporations, and have not hesitated to exercise their rightful jurisdiction for the purpose of restraining them within the limits of their lawful authority, and of protecting the citizen from the consequences of their unauthorized or illegal acts." And all restraints imposed by law to prevent its abuse should be scrupulously enforced. *Western Md. R. R. Co. vs. Patterson*, 37 *Md.*, 134; *Pierce on Railroads*, 87 *to* 100; *Lippencott, et al. vs. Town of Pana*, 92 *Ill.*, 24; *The People vs. Hurlburt*, 46 *N. Y.*, 110; *The People, ex Rel. vs. Smith*, 45 *N. Y.*, 772–780; *Cowdrey vs. Town of Canadea*, 16 *Fed. Rep.*, 532; 1 *Dillon's Municipal Corporations, secs.* 153, 161, 163, 164, (*4th Ed., note.*)

The power of a majority of tax-payers to encumber the property of a minority against their will, is not favored by the common law. It is an *extraordinary* power, and its exercise should be strictly in accordance with the grant. It is of comparatively recent origin, a new invention, upon which reckless and adventurous speculators have seized with avidity, and the abuse of this power has been so great, and its consequences so disastrous that it has been denied by the Constitutions of Pennsylvania, Ohio, Illinois, New York and Missouri,

and stringent and rigid limitations upon its exercise are engrafted into the Constitutions of other States. *Indiana, Art. X, sec.* 10; *Mississippi, Art. XII, sec.* 14; *Maryland, Art.* 3, *sec.* 54, *and Art.* 11, *sec.* 7; *Vide,* 1 *Dillon's Municipal Corporations, secs.* 153, 154, 155, 156, *and* 157, (*4th Ed.*)

This power was not conferred on the Commissioners, because the notice of the election, as required by the Act, was not given in time, and in the very nature of the case, could not have been given in time. The 12th section of the Act of 1872, ch. 245, requires the Act to be submitted to the voters of the county, at an election to be held on the fourth Monday of April next; that the sheriff shall give notice of the said election, in the manner prescribed for other elections held by law. The notice required for every election required by law to be held, is *at least* three weeks previous thereto. Code, Art. 33, sec. 51. The Act was approved on Monday, April 1st, 1872. The fourth Monday was on April 22nd, 1872. It was impossible, after the passage of this Act on April 1st, 1872, to have given *at least* three weeks' (twenty-one days) notice *previous* to the 22nd day of April, 1872, as there were only *twenty clear,* intervening days, counting April 2nd, the first day upon which the notice could be given; and excluding the 2nd day of April, there were only nineteen clear, intervening days. *Meyer vs. Steuart, et al.,* 48 *Md.,* 423; *Walsh, Trustee vs. Boyle, et al.,* 30 *Md.,* 262; *O'Connor vs. Towns,* 1 *Texas,* 107–9; *The People, ex Rel. vs. Jackson County,* 92 *Ills.,* 454; 1 *Dillon's Municipal Corporations, sec.* 164, *and cases collected in note.*

The power was not conferred on the Commissioners, because the Act of 1872, ch. 245, as required by the Act itself, and by Article 3, section 54, of the Constitution of the State, was not published for two months before the next election (November 4th, 1873,) for members of

the House of Delegates, in the newspapers published in said county.

Before the County Commissioners could be empowered to grant any aid to this railroad company, the *three* requirements of this section of the Constitution must be strictly and rigidly complied with.

1. An Act must be passed by the Legislature.

2. A publication of that Act for a specified time in the newspapers of the county.

3. This Act must be approved by a majority of all the members elected to each House of the General Assembly, at its next session after said election.

Each one of these three requirements are of equal importance; no one of the three could be dispensed with; all must be rigidly adhered to and strictly complied with; otherwise no power will be conferred.

This section first became a part of our Constitution in 1867, and was the deliberate act of its framers, and was intended as a restraint and limitation upon the granting of this extraordinary power upon municipal corporations, the reckless and improvident exercise of which, in other municipalities, had swollen the municipal debts of the country to fabulous proportions.

The Act was not published for two months, as required by the Constitution.

The appellant says the "two months" means lunar months, and not calendar months. That calendar months is meant, is settled by the cases of—*Rawlings vs. Adams*, 7 *Md.*, 26; *Glenn, Adm'r, &c. vs. Hebb's Adm'r*, 17 *Md.*, 260–282; *State vs. Mace*, 5 *Md.*, 337; *Meyer vs. Steuart, et al.*, 48 *Md.*, 423.

The appellant further says that this provision of the Constitution, as to the publication of the Act, is simply *directory*, and a failure to publish the Act for the time required is not material. If this requirement of the Constitution could be dispensed with, why could not the

Act itself, and its subsequent approval by the next General Assembly, be dispensed with ? Why, for the same reason, could not all three of these constitutional restraints and limitations, which this Court has always "maintained with jealous vigilance," be utterly disregarded, and the County Commissioners act in the matter without any legislative authority whatever? *Mayor and City Council of Baltimore vs. Gill,* 31 Md., 395.

This requirement of the Constitution as to publication, like the other requirements of the same section, must be rigidly adhered to and strictly complied with. Its insertion in the Constitution was deliberate and for a specific purpose. The exercise of this power had been and was likely to be greatly abused. Other communities were groaning under an improvident exercise of it. Our own State had made investments in the Chesapeake and Ohio Canal and other works, which had yielded no return, and the framers of the Constitution of 1867 determined to throw ample safeguards around, and to impose such limitations and restraints upon, the granting of this extraordinary and unusual power as would protect the rights of over-burdened tax-payers.

When the authorities in the State Courts are examined, it will be found that the drift of the whole of them establishes the proposition that constitutional and legislative conditions *affecting the power* of county boards to issue obligations of this character, have been so strictly construed as to invalidate the bonds even in the hands of innocent holders, where there has been a failure to comply with the conditions. In the Supreme Court of the United States, it is a matter of judicial history that every effort has been made to sustain the validity of State, county and municipal obligations, whenever the rights of innocent holders were involved. But even in the Supreme Court, proceeding to the utmost extreme upon the doctrine of estoppel, it will be found that,

where there was a want of constitutional or legislative power to issue the bonds, tax-payers were not estopped from impeaching them, although in the hands of innocent holders for value. This principle applies with so much greater force in a case of this character, because here no rights of innocent holders are involved, no bonds are issued, no question of estoppel arises, and the tax-payers of Anne Arundel County are merely exercising their constitutional right to prevent the consummation of an unconstitutional Act, and to prevent the railroad company from demanding bonds when it has failed to carry out the very condition that the Constitution imposes upon it, before it can burden the county with a debt in aid of its enterprise. *Dillon's Munic. Corp.*, 4th Ed., secs. 515, 529a; *Dixon County vs. Field*, 111 *U. S.*, 83; *Crow vs. Oxford*, 119 *U. S.*, 215; *German Savings Bank vs. Franklin County*, 128 *U. S.*, 526; *Concord vs. Robinson*, 121 *U. S.*, 165; *Lake County vs. Rollins*, 130 *U. S.*, 662; *Lake County vs. Graham*, 130 *U. S.*, 674; *Buchanan vs. Litchfield*, 102 *U. S.*, 278; *Litchfield vs. Ballou*, 114 *U. S.*, 190; *Northern Bank vs. Porter Township*, 110 *U. S.*, 608, 619.

The resolution of the 6th of June, 1876, is *ultra vires*. There was no such power delegated to the County Commissioners by the Legislature, as was attempted to be exercised under the terms of this resolution. The resolution contains conditions, neither authorized by expression nor by inference in the legislative Act. The first condition interpolated by the County Commissioners was the defining of the route of the railroad through the town of Brooklyn; and the second condition was that the Mayor and City Council of Baltimore should guarantee the bonds of this road to the extent of half a million of dollars. It is not for Courts to pass upon the question whether these conditions are favorable to the tax-payers of the county.

The resolution of the 6th of June, 1876, is repealed by the resolutions of April 18th, 1878, and August 2nd, 1887, and also by the resolution of January 21st, 1890, the latter resolution being the one under which the subscription is now claimed. It is unnecessary to discuss the question whether the resolutions of 1878 and 1887 can operate as a repeal of the resolution of 1876, without the consent of the Baltimore and Drum Point Railroad Company, because *it has expressly given its consent* to the resolution of January 21st, 1890, has expressly assented to the Act of the Legislature under which said resolution was passed, and has expressly waived and abandoned all rights which it possessed under any prior resolution in reference to the said subscription, in so far as any other subscription might differ in terms from the subscription in 1890. The subscription, therefore, under the resolution of 1876, is not before the Court, because it has been cancelled with the consent of the Baltimore and Drum Point Railroad Company. If we should concede that the resolution of 1876, and the acceptance of it by the railroad, amounted to a contract between the parties, there was no attempt made to enforce that contract by the Baltimore and Drum Point Railroad Company.

There is one proposition, however, under the authorities, that is absolutely clear, and that is that if the County Commissioners had the right to annex the conditions in question to the resolution of 1876, and if that resolution is not repealed by the subsequent resolutions of the County Commissioners, then it can only be enforced with its appendant conditions. The defendant asserts the proposition that the resolution of 1876 may be sustained in part and avoided as to the conditions upon which the subscription was made; in other words, when the County Commissioners resolved that they would only subscribe upon the express condition that

the Mayor and City Council of Baltimore should endorse
half a million dollars of bonds of the railroad, that the
County Commissioners can be compelled to subscribe,
whether the Mayor and City Council endorsed the bonds
of the road or not, and this, too, after an express accept-
ance by the road of this conditional subscription.    That
is not the law that governs a case of this sort, and the
following authorities are referred to in support of the
proposition that if that resolution be good for any pur-
pose, it can only be good upon the performance of the
condition that formed the inducement and the considera-
tion for its passage.      *Wood's Railway Law, sec.* 119;
*Brocaw vs. Board of Comm'rs of Gibson County, et al.,* 73
*Ind.,* 549, *and cases there cited; Pierce on Railroads, page*
99; *Bucksport & Bangor R. R. Co. vs. Brewer,* 67 *Me.,*
295; *Virginia & T. R. Co. vs. County Comm'rs of Lyon
County,* 6 *Nevada,* 68; *State vs. County Court of Daviess
County,* 64 *Mo.,* 30; *Wagner vs. Meety,* 69 *Mo.,* 150;
*Parker, et al. vs. Smith, et al.,* 3 *Bradwell, (Ill.),* 356;
*Portland & Oxford Central R. R. Co. vs. Hartford,* 58
*Me.,* 27; *People, ex rel. vs. Town of Clayton,* 88 *Ill.,* 45;
*Taggart vs. Western Maryland R. R. Co.,* 24 *Md.* 595.

The resolution of 1876 has become entirely inopera-
tive because there has been a failure to perform the con-
ditions recited in the resolution.    There has been no
attempt made to secure the performance of them by the
railroad; there is no possibility of an endorsement of
the bonds of the railroad company to the extent of half
a million of dollars by the City of Baltimore, and there
has been an abandonment of all efforts upon the part of
the said road to comply with said condition.    More than
fourteen years have elapsed since the passage of said
resolution, and the gross neglect of the railroad to com-
ply with said conditions deprives it of any further rights
that it may have had in the premises.    The acceptance
by the railroad of the resolution of 1890, without these

conditions annexed, is conclusive evidence of an abandonment by the railroad of all efforts to obtain a performance of said conditions, and they are estopped by their own act from claiming now that they have the right to have said conditions performed.

The resolution of the 21st of January, 1890, is void because it is in direct conflict with the Act of Assembly under which it purports to have been passed. In 1880, all rights that the Baltimore and Drum Point Railroad Company had acquired under the resolution of 1876, were gone by their own default and laches; they applied to the Legislature, as they had frequently applied before, for an extension of time within which the road should be built. The Legislature gave the road this right, with the distinct understanding, expressed upon the face of the Act of Assembly, that this right so given should not revive by implication any right that the road might claim against Anne Arundel County for a subscription to its stock, *"unless the County Commissioners gave their consent to a continuance of said subscription."* A continuance of the subscription, which was then in the mind of the Legislature, was not a cancellation of the subscription. A subscription cannot be continued and cancelled at the same time. The only power, if any, that was conferred upon the County Commissioners was to *continue* a subscription that had been made, and not to make a new subscription in entire conflict with the original one. If it was intended to make a new subscription, as this one is, then the constitutional requirement has not been gratified, which requires the publication of the Act of Assembly, and a confirmation thereof by the next succeeding Legislature.

When the County Commissioners, in 1890, at the suggestion of said Railroad Company, revived this subject and commenced anew to deal with the Baltimore and Drum Point Railroad Company, their powers, if any,

Baltimore and Drum Point R. R. Co. *vs.* Pumphrey, *et al.*

were limited and circumscribed by the Act under which they profess to proceed, but instead of proceeding under it in accordance with its warrant, they have evaded it, and passed a resolution which, instead of continuing the original subscription, makes a new subscription and omits from that subscription the most important feature of the original subscription, which they were authorized to continue, viz., *the endorsement of the bonds of this railroad by the Mayor and City Council of Baltimore.* Therefore, this resolution under all the authorities is void, because there is no authority for its passage, and because it is in direct opposition to the authority conferred upon the County Commissioners by the Act of Assembly, under which it was pretended to have been passed.

The Legislature of 1880 had no power to keep alive the resolution of 1876, because a power once exercised under legislation of this character, is exhausted by the act of exercising it, and Boards of County Commissioners or municipal bodies have no right to enact and repeal proceedings of this sort at random, and whenever it suits their convenience to do so. The resolution of 1876 exhausted all power conferred by the Act of 1872; and if it was intended to confer a new power, the voters of Anne Arundel County had the right, under the Constitution, to have the Act that conferred the power submitted to them by publication, so that they could determine upon the character of their representation in the Legislature succeeding the passing of the Act. *State vs. County Court of Daviess County,* 64 *Mo.*, 30; *The People vs. Town of Waynesville,* 88 *Ill.*, 475, etc.; *Empire vs. Darlington,* 101 *U. S.*, 90.

If there were no one of these points involved in this case, the failure upon the part of the Baltimore and Drum Point Railroad Company to build this road within the time originally prescribed by the Act of Assembly, under which it was chartered, is a surrender of all rights

that it may have had to the subscription made upon the faith and the basis of that important provision in its charter, embraced in the 19th section of the Act. The contract that was made between the voters of Anne Arundel County, by the County Commissioners acting for them, was, that the road should be built in accordance with the requirements of its existing charter. The language of the resolution under which the subscription was made is as follows: "That the road shall be constructed as to comply in all respects with the provisions and requirements of its present existing charter, and the amendments thereto in reference to the construction thereof." The County Commissioners here plainly indicated that what they intended was a subscription to the stock of this road, provided that the road was built through Anne Arundel County within the time limited by the existing legislation, and the company, in express terms, accepted this subscription. It was never contemplated that this subscription should last indefinitely, through as many successive periods of indulgence as the Legislature might grant to this road for its completion. If this were otherwise, the Legislature might extend the time indefinitely, and the Commissioners would be held to their subscription, when, in the meantime, other roads might be built answering the same purpose, and covering the same route. The Legislature had the power, undoubtedly, to extend the time for the completion of this road, but it had no power to annul the contract which the County Commissioners had made, based upon the requirement of its charter, that the road should be built within the time designated. In 1880, the subscription of 1876 had ceased to exist, because the road had not been constructed in accordance with the requirements of this charter, as set forth in the subscription of the County Commissioners; there was no subscription, therefore, upon which the Legislature could act, and if

Baltimore and Drum Point R. R. Co. *vs.* Pumphrey, *et al.*

they intended to confer any new rights upon the Board of County Commissioners, the Constitution required a new proceeding, so that the people could determine whether or not to send to the Legislature of 1882, representatives who would favor or reject the scheme. *Woods' Railway Law, sec.* 119.

ALVEY, C. J., delivered the opinion of the Court.

The bill in this case was filed by a considerable number of the taxpayers of Anne Arundel County, for the purpose of having declared inoperative and without continued effect, the Act of the General Assembly of 1872, ch. 245, and the confirmatory Act of 1874, ch. 225; and also to have declared nugatory and void all the proceedings under those Acts taken by the board of County Commissioners of that county, for the purpose of effecting a subscription to the capital stock of the Baltimore and Drum Point Railroad Company, for and on behalf of the county, to the extent of $200,000. The railroad company was incorporated by the Act of the General Assembly of 1868, ch. 364, to construct and operate a railroad from the City of Baltimore to Drum Point at the mouth of the Patuxent River, in Calvert County; nearly all of the location of the route of such road being within the limits of Anne Arundel and Calvert Counties. By the 19th section of the Act of incorporation, it was provided that if the said road should not be commenced within six years from the passage of the Act of incorporation, and should not be finished within four years from the time of the commencement thereof, then the Act should be null and void.

The bill charges several grounds for impeaching the validity and continued operation of the proceedings and resolutions of the board of County Commissioners, taken professedly under the Acts of Assembly above mentioned, and charges the same to be void and without binding

effect; and the plaintiffs, by proof introduced into the case, impeach the constitutional validity of the Confirmatory Act of 1874, ch. 225, itself.    An injunction is prayed to restrain all proceedings under the Acts, or the resolutions of the Commissioners, and also for general relief.

The County Commissioners and the Railroad Company were made defendants.    The Commissioners failed to appear and answer, and an interlocutory decree was taken as against them.    They left the questions raised by the bill to be contested by the railroad company alone. The railroad company appeared and answered; and by its answer it denies and controverts all the most material allegations and conclusions of the plaintiffs.    Upon proofs taken the case was brought to final hearing; and the Court below decreed in favor of the plaintiffs, and enjoined all further proceedings of the Commissioners under the Acts of Assembly.

There is no question made, and none could be, as to the right of the plaintiffs, as taxpayers of the county, to maintain the bill; that has been decided in several cases in this Court.    *Mayor, &c. of Baltimore vs. Gill, et al.*, 31 *Md.*, 395; *St. Mary's Industrial School for Boys vs. Brown, et al.*, 45 *Md.*, 310.

The Act of 1872, ch. 245, by its first section, authorised the County Commissioners of Anne Arundel County, in the name of and for said county, to subscribe for and hold shares of the capital stock of the Baltimore and Drum Point Railroad Company, to an amount not to exceed $200,000 at the par value of said shares.    And by the second section of the Act, the Commissioners are authorised, *for the purpose of meeting said subscription*, to issue bonds of the county, with interest coupons attached, to the amount of $200,000; and by the eighth section of the Act, it is provided that said bonds, so to be issued, *shall* be received by the railroad company at the par

value thereof, in payment of the shares of stock so to be subscribed for.

By the ninth section of the Act, certain conditions are prescribed upon which the bonds may be delivered to the railroad company; all depending upon the progress of the work within the limits of the county. And in regard to the last instalment of the bonds to be issued, being the one-fourth of the whole amount authorised, it is provided that they shall be delivered to the railroad company, "when the whole of the line of the said railroad, within the limits of said county, shall have been fully built and constructed, and in running order; and that the said bonds shall not be issued or delivered to the said company in any greater instalments, nor at any *earlier* periods, than as above specified; *and, provided,* that no bonds shall be issued under this Act, unless the said company shall, by an amendment of its charter, *agree and bind itself* to run daily at least two through trains of passenger cars, without change of cars, between the City of Baltimore and Annapolis, either over its own road, or in connection with the Annapolis and Elk Ridge Railroad, if its road shall not be extended to Annapolis."

Section twelve of the Act directs that the question of the approval or disapproval of the Act should be submitted to the legally qualified voters of the county, at an election to be held on the fourth Monday of April then next; and as the Act declared that it should take effect from the date of its passage, and it was approved by the Governor on the first day of April, 1872, it spoke from that date, and the election provided for should have been held on the fourth Monday of April, 1873. But, according to the proclamation of the clerk made as required by the provision of the 12th section of the Act, the election was held on the fourth Monday of April, 1872, a year in advance of the proper time. The confirmatory Act of 1874, ch. 225, which professed by

its title to be passed in pursuance of section 54 of Article 3 of the Constitution, was passed, doubtlessly, upon the assumption that the popular election required by the Act of 1872 had been regularly held, and that the Act of 1872 had been duly published as required by the constitutional provision referred to, in the newspapers of the county, "for two months before the election for members of the House of Delegates," which was held on the 4th day of November, 1873. But it now appears, by the production of the county newspapers in Court, under an agreement, that in neither of the two newspapers so produced, was the Act of 1872, ch. 245, published for the full period of two months before the day of election of members to the then next House of Delegates. In the one paper the first insertion of the Act was on the 6th day of September, 1873, and in the other the first insertion was on the 9th of September, 1873. It is therefore clear, that the Act of 1872 was not duly published for two months before the election held on the 4th day of November, 1873.

It is proper to notice in passing that the railroad company applied to and procured from the Legislature of 1876, an Act amendatory of its charter, (Act, 1876, ch. 337,) by which the time for the completion of the road was extended for the period of five years from the first of January, 1877. This Act was approved on the 8th of April, 1876, and it took effect from the date of its passage. It was therefore in operation, as part of the charter of the company, on the 6th of June, 1876, when the County Commissioners first attempted to exercise the power that was supposed to have been delegated to them by the Acts of the General Assembly of 1872, ch. 245, and of 1874, ch. 225.

It is also proper to notice the Act of 1874, ch. 433, whereby the City of Baltimore was authorised to subscribe to the capital stock of this railroad company, or

to indorse its first mortgage bonds, to an amount not exceeding $500,000, upon such terms and conditions as the Mayor and City Council might by ordinance prescribe. That Act was also in force at the time when the County Commissioners attempted to make the subscription on the 6th of June, 1876; but the authority conferred by this Act of 1874 has never been exercised by the city authorities.

As we have just stated, the first proceeding taken by the County Commissioners, under the Act of 1872, to make the subscription on behalf of the county, was on the 6th of June, 1876. But it appears that before that time the railroad company, by its president and directors, had become anxious and active in the matter, and proceeded so far as to consider and determine upon the terms and conditions of the subscription that they sought to obtain from the county, and actually formulated, in the shape of a resolution, the subscription, with the exact terms and conditions therein, as those subsequently adopted by the County Commissioners. This resolution of the board of directors was passed on the 10th of March, 1876, and it was declared, by the same resolution, that the railroad company would, *and did thereby agree,* to accept the subscription for the county, on the terms and conditions thus formulated and set forth in the resolution; and which resolution was transmitted to the County Commissioners, and became the basis of the subscription made by them on the 6th of June, 1876. The terms and conditions thus proposed were adopted, and the subscription ordered to be made accordingly. The order directing the subscription was made matter of record; and it was thereby resolved that the subscription of $200,000 be made in the name of and for Anne Arundel County; "and that the said subscription be made upon the books of the said company, and signed by the president and other members of this board, or

by a majority thereof, and attested by the clerk of the board, with the corporate seal of the board affixed; and that the said subscription be made upon the following terms and conditions, to wit:

"The County Commissioners of Anne Arundel County agree to subscribe to the capital stock of the Baltimore and Drum Point Railroad Company to the amount of two hundred thousand dollars, upon the following terms and conditions, to wit: First, upon the terms and conditions prescribed by the said Act of 1872, ch. 245, authorising such subscription to be made; and, second, upon the further condition that the said company *shall comply in all respects with the requirements of its charter and every amendment thereto in reference to the construction of said road*, and that the said company shall locate and construct its railroad through the town of Brooklyn, in Anne Arundel County; and provided further, that no part of the said bonds shall be issued or delivered to the said company until the Mayor and City Council of Baltimore shall have, by ordinance, provided for an endorsement of the bonds of the said company to the amount of five hundred thousand dollars; and that no part of said bonds shall be delivered to the said company until the said railroad shall be built and equipped from the City of Baltimore to the Annapolis and Elkridge Railroad; and that the said *subscription shall not take effect until these terms and conditions are accepted by the president and directors of said company;* and unless these several terms and conditions shall be complied with, the said subscription shall be null and void; otherwise to be and remain in full force and virtue in law."

This resolution was duly signed and attested; and it was the final resolve of the board upon the subject of the subscription, and what remained to be done was simply of a clerical or ministerial character. We must take the whole proceeding together; and when we consider

the action of the railroad company that preceded and formed the basis, and indeed a principal inducement, of the resolution of the County Commissioners, there would seem to be no room for question that the subscription was made by the Commissioners and accepted by the railroad company, upon the terms and conditions particularly set forth in the resolutions passed by the board of directors and the board of County Commissioners, respectively; and it does not matter in what form the entry of subscription was afterwards made in the books of the railroad company. *Bates County vs. Winters,* 112 *U. S.,* 325, 327. All the terms and conditions embodied in the resolution of subscription formed parts of the contract; and *non constat* that the contract of subscription would ever have been made without such conditions. Indeed, it is expressly declared that the subscription *should not take effect* until those terms and conditions were accepted by the railroad company. And there would seem to be no ground to question the competency of the railroad company to bind itself by the acceptance of such subscription. 1 *Moraw. Corp.,* secs. 78 to 86.

At the time this subscription was made, the railroad company, by an amendment to its charter, had until the first of January, 1882, within which to complete its road. But at the expiration of that time not one of the conditions mentioned in the resolution of subscription, with respect to the construction of the road, had been complied with. And even at the present moment there has been but a part of the grading for the road done within the limits of Anne Arundel County, with no well grounded prospect that the railroad company will be able to proceed with and complete the road—certainly not within any reasonable time to come. In that state of affairs, the Act of 1880, ch. 200, amendatory of the charter of the company, was passed; and among the provisions of the Act there is one extending the time for the

completion of the road, to the first day of May, 1885. But, by the 3rd section of the Act, it is expressly provided, that the extension of the time for the completion of the road should not be construed, "in any way, as to bind the County of Anne Arundel for its subscription to the capital stock of said company, *unless the County Commissioners give their consent to a continuance of said subscription.*" In inserting this provision in the Act the Legislature manifestly acted upon the assumption that the limitation of time for the completion of the road was of the essence of the contract of subscription by the county; and hence the consent of the Commissioners was required to the continuation of the subscription. That consent, however, was never given to the particular subscription of June 6th, 1876.

It is unnecessary to make further reference to the facts of the case as detailed in the record; those that we have stated being sufficient to present the questions that, in our judgment, are decisive of the case. We shall therefore proceed to consider briefly the propositions, or rather the most material of them, that were made and urged at the bar with great ingenuity and ability.

The first proposition urged on the part of the defendant, the railroad company, is, that the subscription of the County Commissioners to the capital stock of the company, authorised by the Act of 1872, ch. 245, is not within the meaning of the terms of section 54 of Article 3 of the Constitution; and therefore the failure to publish that Act two months before the then next election for members of the House of Delegates, as required by the provision of the Constitution and the 13th sec. of the Act of 1872, is immaterial and irrelevant to the question now involved. Of course, if this contention were maintainable, the question whether the Act of 1872 had been published as required by the section of the Constitution would be immaterial; the subsequent Act

of 1874 would cure such defect or omission, so far as the mere requirement in the Act of 1872 is concerned.   But the Acts of the Legislature, both that of 1872, ch. 245, and of 1874, ch. 225, contemplated the power delegated as being within the provision of the Constitution; and we think the Legislature clearly right in so regarding the power.

The argument in support of this proposition is founded upon the particular terms of the section of the Constitution; that no county shall contract any debt or obligation, in the construction of any railroad, canal, or other works of internal improvements, nor give, or loan, its credit to or in aid of any association or corporation, unless authorised by an Act of the General Assembly, &c.   The language of this section of the Constitution is very broad and comprehensive; and with a common knowledge possessed by the whole people of the State, we cannot fail to understand what was intended to be accomplished by this constitutional restriction: It was intended as a constitutional limitation of power, not only of the local authority, but of legislative power itself; and all such cases as the present were manifestly contemplated as being within the constitutional restriction or limitation, being within the evils intended to be restrained.   The Act of 1872, authorising the subscription to the capital stock of the railroad company, also authorised, for the purpose of meeting such subscription, the County Commissioners to issue coupon bonds, which of course would be negotiable; and, in another section, such bonds are required to be received by the railroad company, in payment of the subscription of stock.   The primary object of this subscription, and the issue of bonds therefor, was to enable the railroad company to avail itself of the credit of the county to raise funds with which to prosecute its works; and it was therefore a loan of the credit of the county, in a constitutional sense,

that the bonds were to be issued upon the subscription. *Hill vs. Memphis*, 134 *U. S.*, 198, 205.

The power intended to be conferred by the Act of 1872, ch. 245, being within and subject to the constitutional restriction, it is next contended on the part of the railroad company, that the term "months," as used in the section of the Constitution referred to, should be taken to mean lunar months, and not calendar months; and if that construction be not adopted, then the terms "two months" should be construed as being directory only. But we are unable to adopt either of these constructions. It is established in this State, as it is in many others, that the word "month," when used in a statute, and of course the same when used in a Constitution, means calendar month, unless words be added to show that lunar month was intended. *Rawlings vs. Adams*, 7 *Md.*, 27; *Glenn, Adm'r, &c. vs. Hebb's Adm'r*, 17 *Md.*, 260, 282; *Snyder vs. Warren*, 2 *Cow.*, 518; *Bish. Writ. Laws*, sec. 105, and the cases there cited. And to hold that the terms, as employed in the Constitution, are merely directory and not mandatory, as contended by the defendant, would not only be introducing a lax rule of construction of the Constitution, but such construction would virtually nullify and destroy a valuable safeguard intended as means of bringing to the notice and consideration of the people to be affected, contemplated burdens upon them and their property. For if the constitutional requirement be held to be directory only, the publication might be for half the time prescribed, or it might be omitted altogether, and yet the power would be effective. This was never the design of the constitutional provision; and therefore all the conditions prescribed should be strictly observed; they are all equally essential to the authority attempted to be conferred. Or, as said by the Supreme Court, in *Young vs. Clarendon Township*, 132 *U. S.*, 349, "they are of equal import-

Baltimore and Drum Point R. R. Co. *vs.* Pumphrey, *et al.*

·ance under the law, and one cannot be dispensed with more than another. Neither is directory, but all are mandatory." The question is not what, in the absence of a constitutional restriction, would constitute a valid legislative grant of power, but what the Constitution itself requires; and as the two months publication of the Act of 1872 was essential, as one of the conditions precedent to a valid confirmatory Act, and that publication was not duly made, as required by the constitutional provision, all the constitutional requirements were not complied with, and therefore there was no legal or valid authority conferred and confirmed by the Acts of 1872 and of 1874.

It is urged, however, that it is not charged in the bill as one of the grounds for impeaching the subscription made under those Acts, that due publication had not been made of the Act of 1872, prior to the election of the 4th of November, 1873, and therefore no notice should be taken of such defect. It is true, there is no such specific charge in the bill; but there has been no exception to the sufficiency of the averments of the bill, as could have been taken, (1 Code, Art. 5, sec. 34,) and the proof has been introduced by agreement, without exception thereto upon the ground that there was no corresponding allegation in the bill, to which the proof could be applied. In such case this Court is required to decide the questions raised by the proof.

But if that question were out of the case, as the defendant contends it should be, the next question raised is equally decisive against the defendant, and that is, as to the continuing operation and force of the subscription of June 6th, 1876, upon which the defendant insists the county remains bound.

It is contended on behalf of the railroad company that the terms and conditions of the subscription, additional to those prescribed in the 9th section of the Act of 1872,

ch. 245, were unauthorised, and should be regarded as nugatory and void, and that, without those terms and conditions, the subscription would stand valid, notwithstanding anything that has subsequently occurred. But in this we cannot concur.

In the first place, looking to the circumstances under which the subscription was made, it is very clear the railroad company is not in a position to insist upon the repudiation of the terms and conditions objected to. It was largely instrumental in having those terms and conditions incorporated into the contract of subscription; and good faith requires that it should not take the benefit of the subscription without complying with or fulfilling the conditions. Nor do we concur in the contention that the County Commissioners were without warrant in insisting upon such terms and conditions in the subscription made by them. By the act of subscription a large debt was to be imposed upon the people of the county, whom the Commissioners represented; and the only security and relief from the burden thus imposed, was in the speedy construction and operation of the road. The authority delegated to the Commissioners was of a *discretionary nature,* leaving them to determine, in view of all the facts and circumstances of the case, whether the power should be exercised or not. Of course, they could add no condition that was in conflict or inconsistent with the terms prescribed by the Act of the Legislature; but there is nothing in the Act to negative the right of the Commissioners to add such terms and conditions as would consist with the terms of the power, and were proper for the protection and security of the rights and interests of the community that they represented. The Commissioners are county officials representing the interests of the people of the county, and are clothed with large powers, both of a discretionary and a *quasi* judicial character, in respect of the general administration of county

affairs, to be exercised in the interest of and for the pro-
motion of the public good.   It may be reasonably sup-
posed that it was because of this representative relation
of the Commissioners to the people of the county, and
the nature of the powers that they exercised, that the
power of subscription was delegated to them rather than
to any other agency.   It plainly appears that the condi-
tions added were all of a character to protect and secure
the rights and interests of the county, and were strictly
in accord with the reason and policy of the constitutional
provision under which the Commissioners supposed they
derived their power.   In such case, both reason and
principle would seem to warrant the conditions upon
which the subscription was made (*Nor. Cent. R. Co. vs.
Baltimore City*, 21 *Md.*, 93); and the history of the pro-
jected road, and the facts as disclosed in this record,
well illustrate the wisdom with which the conditions
were incorporated into the contract of subscription.

Assuming, then, that the Acts of 1872 and 1874 were
free of all constitutional objection, the conditional sub-
scription of the Commissioners was a valid contract; and
as such exhausted the power of the Commissioners to
make any further subscription.   And when in 1880,
before any of the more important conditions of the sub-
scription had been complied with by the railroad com-
pany, the latter applied for and obtained an amendment
of its charter, and accepted the same, extending the
time for the completion of the road, with the condition
that it should not, in any way, be so construed as to bind
the county for its subscription, unless the County Com-
missioners should give their consent to the continuation
thereof, the railroad company thereby, in effect, released
the subscription.   The County Commissioners have
never given their consent to a continuation of the origi-
nal subscription as made, and had no power so to do, the
power conferred having been exhausted; and the attempt

to make a new subscription on the 21st of January, 1890, on different and conflicting terms and conditions, was simply a nugatory act.

It follows that the decree of the Court below must be affirmed; and we so order, with costs to the appellees.

*Decree affirmed, with costs.*

(Decided 25th March, 1891.)