Commonwealth Telephone Company and another, Plaintiffs and Appellants, vs. Public Service Commission, Defendant and Respondent: City of Darlington, Interpleaded Defendant and Respondent.

*November 7—December 3, 1935.*

For the appellants there was a brief by *Schubring, Ryan & Petersen*, and oral argument by *Ralph E. Axley*, all of Madison.

For the respondent Public Service Commission there was a brief by the *Attorney General, H. T. Ferguson*, special assistant attorney general, and *Alvin C. Reis*, chief counsel, and oral argument by *Mr. Ferguson*.

For the respondent City of Darlington there was a brief by *W. K. McDaniel*, city attorney, and *La Follette, Rogers & Roberts* and *John Ernest Roe*, all of Madison of counsel, and oral argument by *Mr. Roe*.

FRITZ, J. For the consideration of plaintiffs' contentions on their appeal from the order sustaining the Public Service Commission's (hereinafter called the commission) demurrer to the complaint, and the order overruling the plaintiffs' demurrer to the answer of the city of Darlington (hereinafter called the city), it suffices to note the following matters: Plaintiffs allege in their complaint that the Commonwealth Electric Light Company operates the public utility property involved herein, under an indeterminate permit arising from

a franchise originally granted on May 27, 1897, to one of the plaintiffs' predecessors in interest by the city, and which the latter extended on April 22, 1898, to 1913; that on June 24, 1908, pursuant to the provisions of ch. 499, Laws of 1907, plaintiffs' predecessor surrendered that franchise and received in lieu thereof an indeterminate permit; and that the plaintiffs succeeded to all the rights of the owner under that permit. They also allege that on February 15, 1935, the city held an election, at which four hundred and fifty-five electors voted affirmatively, and sixty-one in the negative upon a question as to whether the city should acquire plaintiffs' public utility property at Darlington; that no notices of that election were posted in the city, although the statute required written or printed notices to be posted at three public places; and that no publication of the time and place of that election was made in the official paper of the city, until on February 7, 1935, which gave only eight days' previous notice, instead of the ten days required by sec. 10.36 (3), Stats. Plaintiffs further allege that the city did not secure the verdict of a jury upon the question of necessity for the taking of the plaintiffs' property; but, after the election on February 15, 1935, gave notice of the result thereof to the plaintiffs and the commission, whereupon the latter noticed a hearing for the purpose of fixing the terms, conditions, and compensation to be paid for such taking; that the plaintiffs have not consented to the acquisition of the property by the city, nor waived their constitutional right to the verdict of a jury upon the question of the necessity for such taking; that the commission is wholly without authority or warrant of law to proceed with the hearing to fix compensation; and that it is necessary to enjoin such proceedings in order to prevent great and irreparable injury to the plaintiffs, etc.

The city, in its answer, denied that the election was void; and that the plaintiffs had not waived their right to have the necessity for taking the property established by a jury ver-

dict. In connection therewith, the city alleged that notice of the time and place of the election was given by the publication of an official notice in the official paper of the city on February 14th, as well as on February 7, 1935; that notice thereof was also published and circulated on February 6, 1935, and February 13, 1935, in the Republican Journal, a weekly newspaper of general circulation in the city, which also carried, on the latter date, a front-page notice in larger type than ordinary news print, requesting the electors to vote in order to help the mayor and city council secure lower electric light rates; that on February 13, 1935, there was distributed from house to house, in the city, a leaflet directed to the voters and asking them to vote "Yes" on February 15th in order to assist the mayor and city council to secure lower electric light rates; that, between 6 and 8 o'clock, on the morning of the election, there were likewise distributed in the city, six hundred and thirty-five copies of "The Buyer's Bulletin," a circular, in which the voters were asked to assist the mayor and city council in their effort to secure lower electric light rates; that on December 21, 1934, there had also been an election upon the question of whether the city should purchase the property (which was erroneously described as belonging to the Commonwealth Electric Light Company, instead of also naming the Commonwealth Telephone Company), and that the result then was five hundred and twenty-three votes in favor and seventy-nine votes against the purchase; that notices stating the time and place of that election, as well as the statutory "information to voters," and a sample referendum ballot were duly published on December 6th, 13th, and 20, 1934, in the official city paper; and that on January 31, 1935, there was also published in the official city paper a news item under the heading, "City Will Hold Another Special Election."

Plaintiffs contend that the special election held on February 15, 1935, by which the city intended to initiate proceed-

ings before the commission, was void because of the city's failure to give ten days' previous notice thereof by publication in the official city paper, and by posting written or printed notices in three public places in the city, in compliance with secs. 10.40 and 10.36 (3), Stats. That contention cannot be sustained in view of the saving provisions in the latter section, and in sec. 5.01 (6), Stats., as construed and applied in *State ex rel. Oaks v. Brown,* 211 Wis. 571, 249 N. W. 50, and the facts and circumstances alleged regarding the publicity which was actually given to the election to be held on February 15, 1935. It is true that because of the provision in sec. 10.40 (1), Stats., that "special elections authorized by law shall be held and conducted and the returns thereof made in the manner and within the time required in the case of regular municipal elections," the special election in question should have been held and conducted in the manner, and within the time prescribed by sec. 10.36, Stats., for regular municipal elections. However, although sub. (3) of that section prescribes that "ten days' previous notice of the time and place of such election and of the officers to be elected shall be given by the city clerk by publication in the official city paper and by posting written or printed notices in three public places in the city," that provision is qualified by the words, "but the failure to give such notice shall not invalidate such election." Furthermore, there is applicable the provision in sec. 5.01 (6), Stats., that, "this title [which, as was held in *State ex rel. Oaks v. Brown, supra,* includes ch. 10, as well as ch. 5 and all other provisions in title II of the statutes] shall be construed so as to give effect to the will of the electors, if that can be ascertained from the proceedings, notwithstanding informality or failure to comply with some of its provisions."

In *State ex rel. Oaks v. Brown, supra,* both of those saving provisions were held applicable to a special election in the city of Oshkosh, as to which there had likewise been a failure

by the city clerk to give ten days' previous notice in compliance with sec. 10.36 (3), Stats. But on the seventh, and also the last day before the election, notice thereof was given by the publication of a facsimile ballot in the official city paper in compliance with sec. 6.21, Stats. That section prescribes that before holding an election at which a question is to be submitted, publication of a facsimile of the official ballot and certain other information shall be made twice in daily or weekly newspapers, "one of which publications in daily papers shall be on the publication day preceding the election and the other publication one week previously." The relator contended that the notice which was published, although the first publication thereof was only eight days prior to the date of the election, should be held sufficient, and that the failure to give ten days' previous notice as required by sec. 10.36 (3), Stats., should not be held to invalidate the election, in view of the provision in that section that "the failure to give such notice shall not invalidate such election." This court, in sustaining those contentions, said:

"We should have great difficulty in sustaining the relator's contention if we were required to determine this question upon general principles of law as declared in prior decisions of this court. *Janesville Water Co. v. Janesville,* 156 Wis. 655, 146 N. W. 784; *Hubbard v. Williamstown,* 61 Wis. 397, 21 N. W. 295; *State ex rel. Manitowoc v. Green,* 131 Wis. 324, 111 N. W. 519."

Then, after concluding that the strict rule applied in the *Janesville Water Co. Case* and other earlier cases had been modified, in 1915, by sec. 5.01 (6), Stats., in respect to all elections held under any of the provisions in title II of the statutes, we said, that, by that enactment:

". . . It is quite obvious that the legislature intended to say that if from the proceedings had pursuant to the statute the will of the electors has been in fact ascertained, that will shall be given effect notwithstanding the informality of pro-

cedure or failure to comply with all of the requirements of the statute. . . . It is manifest that sec. 5.01 (6) applies only after the holding of the election and the will of the electors has been manifested. When the matter has been allowed to proceed to that point, the will of the electors is to be given effect even though there may have been informalities or in some respect a failure to comply with the statute. . . ."

In the case at bar, the notice and information actually given to the electors by the notices, official and otherwise, which were published in the two local newspapers and in the other unofficial publications and circulars in relation to the issue, and the time and place of each of the two elections which were held within a period of but three months, were undoubtedly as widespread and ample as the electors would have received from notices published in strict compliance with the statutes. The fact that, although the official notice for the first election was published over ten days prior thereto, only eighty-two more votes were cast at that election than at the second election, held in but seven days after the first official publication, rather indicates that the notice given for the second election was as ample and effective as the full statutory notice given for the first election. On the other hand, as the similarity in the overwhelming affirmative result at each election so convincingly demonstrates the will of the electors, that will should, as is prescribed by sec. 5.01 (6), Stats., be given effect, notwithstanding the informality of the procedure or the failure to comply with all requirements of the election statutes.

Plaintiffs contend that the commission was not authorized to proceed to fix compensation for the property involved herein because the necessity for the taking thereof had not been established by the verdict of a jury, and the constitutional requirement in that regard had not been waived by plaintiffs' predecessor in interest when it surrendered its

franchise on June 24, 1908, and received an indeterminate permit under and in accordance with ch. 499, Laws of 1907. That surrender was evidenced by a written declaration duly executed and filed by plaintiffs' predecessor on June 24, 1908. In that declaration, plaintiffs' predecessor stated that it was "for the purpose of complying with the terms of ch. 499, Laws of 1907, known as the Public Utilities Law;" and that "it does hereby declare that it surrenders the franchise, license and permit granted by the said city of Darlington" on September 16, 1896, and thereafter amended by an ordinance passed on April 22, 1898, "and also surrenders to said city of Darlington any further or other franchises, licenses or permits heretofore received by" its predecessors from the city; and that it "accepts in lieu thereof an indeterminate franchise or permit, as provided by said Public Utilities Act, being ch. 499, Laws of 1907, said indeterminate permit to be held by said Darlington Electric Light & Water Power Company under all the terms, conditions and limitations of said act." Thus, by the terms of its own declaration, plaintiffs' predecessor surrendered and terminated all of its existing franchises, and, in lieu thereof, accepted the indeterminate permit which was created and provided for by ch. 499, Laws of 1907; and, by virtue of the terms of that chapter as well as that declaration, plaintiffs' predecessor and its successors in interest accepted and held that indeterminate permit "under all the terms, conditions and limitations of said act," including, of course, all provisions in secs. 1797m—77, 1797m—78, and 1797m—81 which were part of that chapter. As that surrender and acceptance were made under and pursuant to the original public utility law, as enacted in and by ch. 499, Laws of 1907, the terms and conditions of that indeterminate permit were such as were stated in the provisions of that chapter as originally enacted, and nowhere else. Those provisions do not appear in their

original form in the public utility law as now embodied in chs. 196 and 197 of the statutes, for the reason that, in the original enactment, the time for exercising the privilege of surrendering an existing license, permit, or franchise and receiving an indeterminate permit in lieu thereof was limited, and when such surrenders were no longer permissible, the provisions therefor were removed from the public utility law by revision of the statutes. Consequently, in order to determine the terms and conditions of the indeterminate permit under which the plaintiffs are operating as a public utility in Darlington, we must look to the provisions of the original public utility law as it was when enacted.in ch. 499, Laws of 1907, and which, as so enacted, consisted of secs. 1797m—1 to 1797m—108, Laws of 1907.

In 1907, sec. 1797m—77 (so far as here material), provided that—

"Any public utility, . . . operating under an existing license, permit or franchise shall, upon filing at any time prior to . . . July 1, 1908, . . . a written declaration legally executed that it surrenders such license, permit or franchise, receive by operation of law in lieu thereof, an indeterminate permit, as provided in this act; and such public utility shall hold such permit under all the terms, conditions and limitations of *this act*. . . ."

Consequently, the indeterminate permit received by operation of law as a grant from the state, in lieu of the franchise which it surrendered on June 24, 1908, was held by plaintiffs' predecessor in interest subject to all the terms, conditions, and limitations of secs. 1797m—78 and 1797m—81, as well as in sec. 1797m—77, of ch. 499, Laws of 1907.

The broad and comprehensive terms, "all terms, conditions and limitations of this act," which are used in that reservation, do not confine the scope thereof to only the condition stated in the concluding sentence of sec. 1797m—77,

viz., that, "the filing of such declaration shall be deemed a waiver by such public utility of the right to insist upon the fulfilment of any contract theretofore entered into relating to any rate, charge or service regulated by this act." On the contrary, under that reservation, as worded, there were equally applicable to all indeterminate permits granted by operation of law in lieu of existing franchises surrendered under ch. 499, Laws of 1907, prior to July 1, 1908, the provisions in sec. 1797m—78, Laws of 1907, that—

"Any public utility accepting or operating under any license, permit or franchise *hereafter granted* shall, by acceptance of any such indeterminate permit be deemed to have consented to a future purchase of its property actually used and useful for the convenience of the public by the municipality in which the major part of it is situate for the compensation and under the terms and conditions determined by the commission, and shall thereby be deemed to have waived the right of requiring the necessity of such taking to be established by the verdict of a jury, and to have waived all other remedies and rights relative to condemnation, except such rights and remedies as are provided in this act."

The italicized words in that provision which limit its applicability to any utility accepting or operating under any license, permit, or franchise "hereafter granted" were sufficiently comprehensive to include all such grants, made subsequent to July 11, 1907 (when ch. 499, Laws of 1907, became effective), whether they were created by operation of law under ch. 499, Laws of 1907, because of the surrender of an existing franchise and the acceptance of the indeterminate permit in lieu thereof, or whether they were created in some other manner by the state or one of its authorized agencies. In either event, a utility voluntarily accepting or operating under an indeterminate permit, whether granted by operation of law or otherwise, after ch. 499, Laws of 1907, became effective on July 11, 1907, was thereby con-

clusively deemed, under and by virtue of sec. 1797*m*—78, Laws of 1907, (1) to have consented to a future purchase of its property actually used and useful for the convenience of the public by a municipality in which the major part of it is situated, for compensation and under terms determined by the commission; (2) to have waived the right of requiring the necessity of such taking to be established by the verdict of a jury; and (3) to have waived all other remedies and rights relative to condemnation except such as were provided in the act.

Plaintiff contends, however, that because the legislature, in providing in sec. 1797*m*—78, Laws of 1907, that the consent and waiver therein prescribed were to be deemed to have been given by a utility by its "acceptance" of an indeterminate permit, did not, in that connection, also expressly state that those consequences were to follow upon a surrender of an existing franchise in connection with such an acceptance, that therefore those provisions as to the consent and waiver were not applicable to a utility upon its acceptance of an indeterminate permit resulting by operation of law under sec. 1797*m*—78, Laws of 1907, upon its surrender of existing franchises, etc. No such undue significance can reasonably be attached to the mere omission to also use the word "surrender" in connection with the word "acceptance" in that provision. On the one hand, the obvious purpose and scope of that unambiguous provision, prescribing that such consent and waiver would result upon acceptance of an indeterminate permit, clearly is that those consequences were to result whenever there was a voluntary acceptance of an indeterminate permit granted under ch. 499, Laws of 1907 (prior to the enactment of ch. 596, Laws of 1911, which provided for the compulsory substitution of indeterminate permits for licenses, permits, or franchises granted prior to July 11, 1907), regardless of whether the in-

determinate permit granted was, or was not, preceded by the surrender of an existing franchise. On the other hand, as sec. 1797*m*—78, Laws of 1907, provided that those consequences were to follow upon an acceptance of an indeterminate permit, and as there are no words in that section to indicate that the meaning of the words "by acceptance of any such indeterminate permit," as there used, was to be restricted to acceptances which were not preceded by surrenders of existing franchises, it would be indeed an unduly narrow construction, even in the absence of convincing indications to the contrary in other sections of ch. 499, Laws of 1907, hereinafter referred to, to hold that the provisions as to such consent and waivers in sec. 1797*m*—78, Laws of 1907, are not equally applicable to an acceptance preceded by surrender of an existing license, permit, or franchise.

However, that no such restricted meaning was intended by the legislature is convincingly shown by the following explicit provision in sec. 1797*m*—81, Laws of 1907, which (as a counterpart to sec. 1797*m*—78, Laws of 1907, in so far as the latter prescribes the conditions in respect to consent and waiver by a utility, which attach to its acceptance of an indeterminate permit in lieu of a voluntarily surrendered franchise) defines the conditions applicable under ch. 499, Laws of 1907, to a municipality which has determined to acquire an existing utility. Thus, sec. 1797*m*—81, as enacted as part of ch. 499, Laws of 1907, provided that:

"If the municipality shall have determined to acquire an existing plant and the public utility owning such plant shall have consented to the taking over of such plant by the municipality by acceptance of an indeterminate permit as provided herein, or, in case such public utility shall not have waived or consented to such taking, if the jury shall have found that a necessity exists for the taking of such plant, then the municipality shall give speedy notice of such determination and of such consent or such verdict of a jury to the public utility and to the commission."

There again, it is stated in unambiguous terms that the utility "shall have consented to the taking over of such plant by the municipality" by reason of its acceptance of an indeterminate permit, as provided in ch. 499, Laws of 1907.

That that was the intended legislative meaning, likewise appears from the fact that the provision in sec. 1797m—80, Laws of 1907, which requires a municipality to bring an action in the circuit court for an adjudication as to the necessity of taking utility property, was made applicable only "if the municipality shall have determined to acquire an existing plant *then operated* under a license, permit or franchise *existing at the time this act takes effect* . . ." (*i. e.*, July 11, 1907). Under the terms of that provision, although an adjudication was required as to plants proposed to be taken, which were "then operated" under franchises existing on July 11, 1907, it was not required as to plants which had been *theretofore,* but were no longer being, operated under such franchises because indeterminate permits had been accepted in lieu thereof subsequent to July 11, 1907. Consequently, under the maxim, *expressio unius est exclusio alterius,* plants in the latter class were excluded from the scope of that requirement. The fact that the legislature limited the scope of that requirement to plants which were still being operated under *un*surrendered franchises existing on July 11, 1907, confirms the conclusion that such an adjudication was considered unnecessary as to the property of a utility operated by it under an indeterminate permit which it had accepted under sec. 1797m—77, Laws of 1907, because by such acceptance, the utility was deemed, under sec. 1797m—78, Laws of 1907, to have waived its right to such an adjudication.

The foregoing conclusions are in accord with statements in the opinions filed in *Appleton Water Works Co. v. Railroad Comm.* 154 Wis. 121, 142 N. W. 476; *Janes v. Racine,* 155 Wis. 1, 143 N. W. 707; and *Connell v. Kaukauna,* 164

Wis. 471, 159 N. W. 927, 160 N. W. 1035. Those cases likewise dealt with the municipal acquisition of public utility property operated under an indeterminate permit, accepted upon the surrender, prior to July 1, 1908, of franchises which existed at the time ch. 499, Laws of 1907, became effective. There was no jury verdict as to the necessity of taking the property, but the utilities did not object on that ground. In connection with passing upon other issues, this court concluded that no such verdict was necessary. Thus, in the *Appleton Water Works Co. Case, supra,* the court said (page 135) :

". . . When, however, a public utility company elects to surrender its franchise and receive an indeterminate permit under the utilities law, it consents to sell its plant to the city at any time when the city desires to take it, and consents also that it will abide by the provisions of the utilities law as to the method of securing its compensation. In effect, it embodies all the provisions of the utilities law bearing on the subject into its consent, and agrees to be bound by them. . . ."

In the *Janes Case, supra,* the court said (page 19) :

"By accepting the indeterminate permit the Racine Water Company stipulated to sell its property to the city under the terms and conditions contained in the Public Utility Act as supplemented and safeguarded by the constitution of the state. This it was competent to do, and this it did by accepting an indeterminate permit. We are therefore called upon only to see that the provisions of such act and of the constitution are complied with in the making of the purchase."

And likewise, in the *Connell Case, supra,* the court said :

"It seems to us that the acceptance of an indeterminate permit by a public utility amounts to this : That a verdict of necessity is thereby perpetually waived and the utility consents that proceedings to acquire its property may be initiated at any time by the municipality and it consents that its property may be acquired in the particular manner prescribed by the act." (p. 487.) ". . . The owner in this case having consented, by the acceptance of an indeterminate permit,

that its property be taken, the taking was not against the consent of the owner, and the verdict of a jury as to necessity was not required. . . ."  (p. 489.)

It follows that, in the case at bar, the plaintiffs' predecessor in interest likewise waived the right of all owners and operators of the utility property in question to require a verdict of a jury as to the necessity of the proposed taking of that property; and that, as the city has duly determined by a valid election to acquire that property, the orders overruling plaintiffs' demurrer to the answer and sustaining the commission's demurrer to the complaint were proper.

*By the Court.*—Orders affirmed.