DUTTON ET AL. *v.* TAWES, ETC.
[No. 1, September Term, 1961 (Adv.).]

*Decided June 12, 1961.*

The cause was reargued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT, HORNEY and MARBURY, JJ., and MACGILL, J., specially assigned.

*Hyman A. Pressman* for the appellants.

*Joseph S. Kaufman, Deputy Attorney General,* and *James O'C. Gentry, Assistant Attorney General,* for the appellee.

HAMMOND, J., delivered the opinion of the Court.

Appellants are Southern Maryland citizens and taxpayers who earn their livelihood there by fishing, crabbing and oystering in the Potomac River. On their own behalf and on behalf of all others similarly situated who might desire to make themselves parties, they filed a bill in the Circuit Court of Baltimore City to enjoin the Governor from proclaiming Chapter 269 of the Acts of 1959, a compact with the State of Virginia relating to the Potomac River, to have been adopted by the people of Maryland as a law of the State in a referendum vote which had been taken at the election of November 8, 1960. The bill also prayed declarations (1) that the text of Ch. 269 had not been published prior to the election as required by Sec. 5 of Art. XVI of the Maryland Constitution and Code (1957), Art. 33, Sec. 170, and therefore the vote on the proposed law was void, and (2) that the Act is unconstitutional because (a) it authorizes a joint commission of Marylanders and Virginians to regulate and police the conduct of Marylanders on the Maryland owned Potomac River; (b) it empowers Virginia courts to try Maryland citizens for the commission of crimes on the Potomac River; (c) it delegates to the Joint Commission the legislative power to reduce punishment for criminal offenses on the Potomac River; (d) it usurps the power of future legislatures by binding them to make annual appropriations of not less than $50,-000 for the Joint Commission; (e) it abdicates the Legislature's power to pass laws relating to fish, crabs, oysters and clams in the Potomac River after December 1, 1958; and (f) the title is deficient.

Judge Sodaro held the Act to have been duly approved by the voters and to be constitutional.

The origin and history of the compact of 1785 between Maryland and Virginia as to the Potomac River—which pro-

vided, inter alia, that "the right of fishing in the river shall be common to, and equally enjoyed by, the citizens of both states * * *"—and the definitive fixing of the low water mark on the south shore of the river as the boundary between Maryland and Virginia by the so-called Black-Jenkins Award of 1878 (with the approval of Congress, in 1879), all are set out in the opinion in *Barnes v. State*, 186 Md. 287, 295. The two states long have had difficulties over the matters of fishing and oystering in the River.

These disagreements resulted in the unilateral abrogation of the compact of 1785 by the General Assembly of Maryland by the passage of Ch. 766 of the Acts of 1957. Virginia soon thereafter filed a complaint in the Supreme Court of the United States seeking to have the compact declared forever binding on Maryland and Virginia. The Court referred the case to Mr. Justice Stanley Reed, retired, as Special Master and a stay was ordered to permit the reaching of an agreement. The Governors of the two states appointed commissioners to resolve the differences, and the proposed compact of 1958 resulted from their efforts. The General Assembly of Virginia approved it, as did the General Assembly of Maryland by the passage of Ch. 269 of the Acts of 1959.

The Act was forced to referendum in Maryland by the signatures of almost 13,000 voters under the provisions of Art. XVI of the Maryland Constitution. At the election of November 8, 1960, some 449,347 voters recorded their preferences as to the Act, 244,510 citizens voting for its adoption and 204,837 against.

The manner in which the text of Ch. 269 of the Acts of 1959 was published is the primary target of the appellants.

The Maryland Constitution, by Art. XVI, Sec. 5 (a), provides that "The General Assembly shall provide for furnishing the voters of the State the text of all measures to be voted upon by the people; provided, that until otherwise provided by law the same shall be published in the manner prescribed by Article XIV of the Constitution for the publication of proposed Constitutional Amendments." Article XIV requires publication before the election "in at least two news-

papers, in each County, where so many may be published" and in three newspapers in Baltimore City "once a week for four weeks." By Chapter 335 of the Acts of 1941 (codified as Sec. 208 of Art. 33 of the Code of 1951) the Legislature specified that the text of a referred law should be furnished the voters by publication "once in some daily newspaper of general circulation throughout the State." This continued to be the law until the passage of Ch. 739, Sec. 170, of the Acts of 1957 (codified as Art. 33, Sec. 170), which requires publication by "at least by one insertion in two or more newspapers within the several counties of the State and in all the daily newspapers published in Baltimore City which will publish the same at the current rate of commercial advertising."

Because the employees of the Secretary of State's office continued to publish according to the 1941 law, instead of complying with the revisions of the Acts of 1957, the text of Ch. 269, the proposed compact, was published but once, in one newspaper, the Baltimore Sun, a paper which has a general circulation throughout the State, although of late years in many counties its readers are few in comparison to the total population. The texts of proposed constitutional amendments which were to be voted on at the same election of 1960 were published in fifty-three County papers and in three Baltimore City papers. It is not contended that the mistake in the publication of the text of the compact was other than unintentional.

The appellants argue that the constitutional and statutory provisions are mandatory and, therefore, the failure to follow them strictly invalidates the favorable vote on the compact. The appellee replies that after an election has been held, the courts treat such requirements as directory, that they were substantially complied with, and the failure to follow them strictly was not shown to have affected the results of the vote.

In reaching a decision, we treat the implementation by Code (1957), Art. 33, Sec. 170, of the constitutional mandate that the electorate be "furnished" the text of referred laws as establishing a statutory, rather than a constitutional, method

of procedure. There are many ways in which the constitutional imperative that the content of referred laws be made available to the voters could be gratified. One is the way the Legislature deemed adequate from 1941 to 1957. If the election now challenged had been held in the first five months of 1957 no serious objection could have been made that the text of the compact had not been properly and adequately "furnished" the electorate. The 1957 Act substituted one statutory method for another. We test the adequacy of compliance with the 1957 Act by the standards the Courts have applied to statutes specifying the manner and extent of notice of elections or of the publication of issues to be voted on in elections.

The Maryland cases, like those elsewhere, have held that there is a clearly recognized difference between the effect given to modal provisions of the election laws before election and the effect of the same provisions after election. Election officials of course should do what the law tells them to do and, before election, a court will require that they do their duty. Yet if the election has been held before court action is sought and it is not shown that the failure of the officials to follow the law has interfered with the full and fair expression of the will of the voters, that expressed choice will not be disturbed by the Courts. *Wilkinson v. McGill,* 192 Md. 387, 393; *Graham v. Wellington,* 121 Md. 656, 661; *Seyboldt v. Mayor & C. C. of Mt. Ranier,* 130 Md. 69, 73; *Carr v. Town of Hyattsville,* 115 Md. 545, 549-550. The latest statement of the rule in this Court was in *Lexington Park Volunteer Fire Department, Inc. v. Robidoux,* 218 Md. 195, 200: "It is generally held that an election which has been honestly and fairly conducted will not be vitiated by mere failure to follow the statute precisely unless the result is shown to have been affected or the statute expressly states that such failure renders the election void. After the election is held, statutes giving direction as to the mode and manner of conducting it are generally construed as directory, unless the deviation from the prescribed forms of the law had so vital an influence as probably to have prevented a free and full expression of the popular will. The courts reason that it would be unjustifiable to defeat the expressed will of the electorate if the irregularity

did not frustrate or tend to prevent a free expression of the electors' intention or otherwise mislead them."

Appellants rely primarily on *Baltimore & Drum Point RR. Co. v. Pumphrey,* 74 Md. 86; *County Commissioners of Montgomery County v. Henderson,* 122 Md. 533; and *Graf v. Hiser,* 144 Md. 418, as holding the modal requirements of the election laws mandatory. The cases are distinguishable. In the *County Commissioners* case aid of the Court was sought before election and in *Graf v. Hiser* the result of the election was deemed to have been affected by the irregularity.

Although two elections were involved in the *Drum Point* case, the decision turned on the interpretation of Art. III, Sec. 54, of the Maryland Constitution, which provides that no county shall give or loan its credit to an association or corporation unless authorized to do so by an act of the Legislature "which shall be published for two months before the next election for members of the House of Delegates * * * and shall also be approved by a majority of all the members elected to each House of the General Assembly at its next session after said election." The Court held that an act authorizing Anne Arundel County to lend its credit to a railroad company, passed in 1872 (which provided for a referendum at an election that should have been held on the fourth Monday in April 1873, but was held on the fourth Monday in April 1872), and a confirmatory act of 1874, were both invalid because there had not been a publication of the act of 1872 for two months before the election of the members of the House of Delegates in November 1873 as prescribed by the Constitution. The Court held that the two months' publication was one of the essential conditions precedent to a valid confirmatory act, and since all constitutional requirements had not been complied with, the authority attempted to be conferred upon the county had never been validly conferred.

The election cases hold generally that if a statute specifies that failure to follow its procedure shall invalidate the election, the required procedures must be followed or there is no valid election and the holding of the Court in the *Drum Point* case in effect was that it was implicit in the constitutional requirement that failure to follow its prerequisites would invalidate subsequent action.

Appraising the case before us by the standards of the decided cases, it is clear there was no substantial compliance with the statutory requirements as to publication. Reproduction of the text of an Act in one paper, when the statute directs reproduction in fifty-six papers, cannot be stretched to amount to substantial compliance. We think, however, that the record shows there was substantial, if not full, achievement of the purpose of the statute to acquaint the electorate fully with the law involved, and nothing to show that the deviation from the prescribed mode of acquainting, misled the voters or prevented, frustrated or interfered with a free, full and intelligent expression of the popular will. In the months before the voting, the Baltimore Sun published seventeen articles and four editorials on the compact and the Baltimore News-Post six articles and four editorials. The Washington Post and Washington Evening Star, which are widely read in Southern Maryland, and in Montgomery and Frederick Counties, published respectively six articles and one editorial and twelve articles and three editorials. There were various articles and editorials published in papers in sixteen of the Counties.

There were published in all some one hundred twenty-two articles, in many of which the views pro and con of public officials and prominent citizens as to various aspects of the compact were reported at some length. There were published throughout the State many letters to the editors, some one way, some the other. There were numerous radio and television news broadcasts relating to the proposed compact, including a purchased television program at which those who share appellants' views as to the undesirability of the compact attempted to persuade the electorate to see things their way. William J. McWilliams, Esquire, of the Maryland Bar, delivered a speech discussing exhaustively all of the aspects and particulars of the proposed compact on June 18, 1959, before lawyers from all over the State assembled at Atlantic City for the meeting of the Maryland State Bar Association. The speech was printed in full in the Daily Record of June 19, 1959. The Official Specimen ballot which contained a brief summary of the contents of Ch. 269 (as did, it would appear

from the record, the sample ballots distributed by both of the major political parties) was published in fifty-three County papers and in three in Baltimore City.

The total vote on the compact of 449,347 was larger than that cast for and against all but two of the fifteen constitutional amendments voted on at the same time. It was 42½% of the 1,055,346 votes cast for President in Maryland in 1960. In 1956 some 932,000 Maryland votes were recorded in the presidential election. The highest total vote that year on a referred question was 42½% of the presidential total, or 394,773 votes on a constitutional amendment as to absentee voting by the physically disabled. Maryland Manual 1959-1960, pp. 383, 392. In 1952 the percentage of the highest vote on a referred law was 42⅓% of the presidential total. Maryland Manual 1953-1954, pp. 305, 309.

The appellee has produced figures showing the number of votes cast for President, and on each of the fifteen amendments (which were fully advertised), and on the compact, in each of the Counties of the State and in Baltimore City. The average vote on questions in relation to the vote on presidential candidates varied from a high of 57.58% in Baltimore County to a low of 12.54% in Somerset County. In twenty-one of the twenty-three Counties and in Baltimore City the vote on the compact was greater than the average vote on all the questions. In Baltimore City and in Baltimore County, where the Sun, in which the text of the compact was printed, has its largest circulation, the average percentages and the compact percentages were, respectively, 33.93% and 34.60%, and 57.58% and 56.79%. In Allegany County the average percentage was 17.71% and the compact percentage was 25.34%. In Somerset County the average was 12.54% and the compact average was 30.90%. In Washington County the percentages were 23.63% and 31.78%, and in Calvert County 26.16% against 36.41%. Montgomery County showed 57.72% to 61.42%.

We cannot assume that the almost 450,000 people who voted on the compact, or any substantial proportion of them, did not understand the issue on which they voted. A contention that the voters of Baltimore did not know what they

were doing when they approved the airport loan of 1927 because the whole ordinance was not printed on the ballot was rejected in *Douty v. Mayor & C. C. of Baltimore,* 155 Md. 125, 138, where Judge Sloan said for the Court: "* * * we cannot now assume that more than 66,000 voters who endorsed the project and the loan did not know what they were voting for."

In factual situations comparable to that before us, courts have supported the upholding of elections despite only partial compliance, or even non-compliance, with modal provisions as to notice or the holding of elections on various grounds. Some have found substantial compliance with statutory requirements, others have said that provisions would be construed as mandatory before election but as directory after the election had been fairly held. The latter reasoning, as we have suggested earlier, may be an imprecise, if not inaccurate, rationalization of what Judge Marbury said for the Court in *Wilkinson v. McGill, supra,* at page 393 of 192 Md., that when an election has been held and it is not shown that the failure of election officials to hew strictly to the statutory line has prevented a full and fair expression of the will of the voters the Courts will not disturb the result. All of the cases turn fundamentally on whether the mistake in procedure has caused harm by misleading the electorate or by tending to prevent or frustrate an intelligent and full expression of the intent of the voters.

A number of courts have held that achievement of the result intended by the requirement of statutes as to notice or publication—that is, the apprising of the voters of the issue to be voted on—by non-statutory methods, such as newspaper, radio and television discussions or private advertisements or circulars, will be enough to uphold an election at which there was a full and apparently free vote. 3 McQuillin, *Municipal Corporations* (3rd Ed.), Sec. 12:10, pp. 77-78, says that whether provisions are regarded as mandatory or directory the rule usually applied is that irregularities which do not affect the result of an election will not invalidate it, for the courts prefer to give effect to the popular will, and adds in Sec. 12:12, p. 94: "But an election will be sustained, notwith-

standing the want of the usual proclamation or other prescribed notice, or defect in giving the required statutory notice, if the electors had general knowledge of it, and a reasonable number of votes were polled." See also 29 C. J. S. *Elections,* Sec. 74, p. 100.

In *Groom v. Port of Bellingham* (Wash.), 65 P. 2d 1060, the prescribed statutory notice of an election covered the matters of certain port and public utility districts but gave no notice whatever of a resolution of the Commissioners of Bellingham to improve its harbor and to issue bonds to pay for the improvements which was also to be voted on. The approval at the election of the harbor improvements and the issuance of the bonds was challenged. The Court stated the general rule that an election will not be declared invalid for irregularities when it appears that the result 'was an "intelligent expression" of the popular will and the want of statutory notice did not deprive enough voters of their franchise to change the result, and said (pp. 1060-1061):

> "To this election, aside from the election notice, there was given wide publicity. The matter of the improvement of the port and the issuing of the bonds was discussed in the newspapers, over the radio, at public meetings, and 30,000 copies of the official ballot, which carried the propositions here in question, were circulated generally and extensively to the voters throughout the county. Appearing upon the election ballot at the general election, there were constitutional amendments, initiatives, referendums, and other propositions, and upon these approximately the same number of votes were cast as were cast upon the port propositions. A port commissioner was elected, and the vote cast for port commissioner was likewise practically the same as the vote upon the propositions stated."

and then concluded:

> "In the case now before us, if the election notice had contained the propositions referred to and there had been given no further publicity to the matter

whatever, the election would have conformed to the law and would have been valid. So far as advising the voters was concerned, the publishing and posting of the notice would have been merely nominal in comparison with what was done in this case in an endeavor to bring to the attention of the voters of Whatcom county the propositions that they were to vote upon relative to the port. It may be true, and probably is, that no one failed to vote upon the propositions because they did not appear upon the election notice. It unquestionably is true that not a sufficient number of the voters failed to vote to change the result of the election. The vote was such, as compared with the votes upon other propositions, as to indicate an intelligent and well-informed expression of the popular will."

See also *Vickers v. Schultz* (Wash.), 81 P. 2d 808, 810; and *Shaw v. Shumway* (Wash.), 99 P. 2d 938, 941.

The same reasoning was followed by the Supreme Court of Wisconsin in *Commonwealth Telephone Co. v. Public Service Commission,* 263 N. W. 665, 668 ("[I]nformation actually given to the electors by the notices, official and otherwise * * * and in the other unofficial publications and circulars in relation to the issue * * * were undoubtedly as widespread and ample as the electors would have received from notices published in strict compliance with the statutes."); and in *Bay County v. Hand* (Mich.), 241 N. W. 256, 258 ("The record is wholly to the effect that the matter was given widest publicity by public discussion throughout the county and by the press and otherwise, and is likewise to the effect that the irregularities were without prejudice, and they will therefore be held not fatal to validity of bonds") and in *Commonwealth v. Kelly* (Pa.), 100 Atl. 272, 274. See also *Michigan Public Service Co. v. City of Cheboygan* (Mich.), 37 N. W. 2d 116, 128; *Flake v. Board of Com'rs* (N. C.), 135 S. E. 467; *Phillips v. City of Rock Hill* (S. C.), 198 S. E. 604, 607. Oklahoma followed the same reasoning as to a constitutional requirement in *State v. Long,* 63 P. 2d 60, 62.

In *Gollar v. City of Louisville,* 219 S. W. 421, the Court of Appeals of Kentucky upheld an election at which a bond issue had been approved, although the direction of the ordinance authorizing the bonds that its text be published in each of the daily morning and afternoon papers in Louisville for at least ten days prior to the day of election had been completely ignored. The Court noted that newspaper publicity had been long and extensive and that there had been placards, posters and moving picture "flashes" as to the bond issue— which it characterized as "a literal bombardment of publicity," and said (p. 422):

> "It is difficult to see how much greater publicity could have been given to the matter, and it would seem almost impossible, with these matters so constantly and continuously before them, that many citizens of Louisville could have failed to know and understand the nature, the object, the need, and the purpose of the bond issue. True, the ordinance in its entirety was not embodied in any of the articles of advertisements, but the main points were featured time and again. The object sought by publication is to bring the ordinance to the attention of the people, that they might be thoroughly posted and advised of its import, and thus enabled to vote intelligently upon the measure."

We conclude that, as in the cases discussed above, there is no real indication, much less a showing, that the voters were not as fully informed about the proposed compact as they would have been had the text been published in fifty-six newspapers, as the current statute contemplated, rather than in one. We see no persuasive evidence that the will of the electorate was not knowingly, fully and freely expressed, unaffected to any discernible extent by the failure to publish the text as extensively as prescribed, and hold that Ch. 269 of the Acts of 1959 was effectively approved by the voters of the State on November 8, 1960.

We pass to the matters as to which the appellants sought declarations of unconstitutionality. They allege that the Act

must fall under Art. III, Sec. 29, of the Maryland Constitution for the failure of its title to have fairly advised the Legislature and the people of the real nature of the bill. The title states that the bill is an act to ratify the compact of 1958 with Virginia, which established a joint commission with the duties of conserving the fishery resources and managing and controlling fisheries in a portion of the Potomac River, and which established a system of licenses "for the taking of fishery resources" from the River by the citizens of both states and which related "generally to the supply, management, control, conservation, taking and use of the fishery resources in a portion of the Potomac River between the State of Maryland and the Commonwealth of Virginia and to the powers and duties of the said joint commission and of the citizens of the two states with relation to these fishery resources * * *," and which provided for the codification of the compact.

The appellants complain that there is no reference in the title to the fact that (a) existing licenses are to be cancelled six months after the effective date of the Act, (b) Virginia Courts are empowered to try Maryland citizens for crimes committed on the River and to confiscate their boats and equipment, (c) Maryland laws as to finfish are frozen as of December 1, 1958, and (d) Maryland agrees to make annual appropriations for the expenses of administering the compact of not less than $50,000.

We have held often, and recently, that while a title must fairly indicate the subject of the legislation, it need not give an abstract of the act or specify the means by which the purposes are to be accomplished, as long as it is not misleading. *Allied American Co. v. Commissioner,* 219 Md. 607, 614, 615; *Leonardo v. Bd. of County Comm'rs,* 214 Md. 287, 299, 300; *Bd. of County Comm'rs of Prince George's County v. Donohoe,* 220 Md. 362, 366, 367; *Jacobs v. Klawans,* 225 Md. 147, 153.

We see nothing misleading in the title now challenged, and think it described the legislation with fairness and sufficient fullness to meet the constitutional requirements in Art. III, Sec. 29, that "* * * every Law * * * shall embrace but one subject, and that shall be described in its title * * *."

The remaining matters which appellants ask the Court to declare unconstitutional are largely those the omission of which from the title they contend made it defective, that is, legislative power has been abdicated and unpermissibly delegated, and the State of Virginia has been authorized to police crime on the Potomac, a Maryland river, and to try Maryland citizens in its Courts for crimes committed on the River.

It cannot be doubted that the power to make a contract by statute, that is to say, a compact, with a sister state, is a power inherent in sovereignty limited only by the requirement of Congressional consent under Art. I, Sec. 10, of the Constitution of the United States. *Canal Co. v. Rail Road Co.*, 4 G. & J. 1, 129, et seq.; Frankfurter and Landis, *The Compact Clause of the Constitution, a Study in Interstate Adjustments*, 34 Yale L. J. 685. The use of a compact for the execution of governmental functions is not an abdication but an exercise of government. "The compact—a legislative means—adapts to our Union of sovereign States, the age-old treaty making power of independent sovereign nations," as Mr. Justice Brandeis said for the Court in *Hinderlider v. La Plata R. & Cherry Creek Ditch Co.*, 304 U. S. 92, 104, 82 L. Ed. 1202, 1209.

It has been held that the states of the Union may validly agree by compact with other states to delegate to interstate commissions or agencies legislative and administrative powers and duties. *Hinderlider v. La Plata R. and Cherry Creek D. Co., supra; West Virginia v. Sims*, 341 U. S. 22, 95 L. Ed. 713; *Application of Waterfront Commission of New York Harbor* (N. J. Super.), 120 A. 2d 504, 509. The *Sims* case also held that the contract of a state to provide annually its respective proportion of the expenses of an interstate commission was binding and enforceable. See also *Petty v. Tennessee-Missouri Bridge Comm.*, 359 U. S. 275, 3 L. Ed. 2d 804; *New York v. O'Neill*, 359 U. S. 1, 3 L. Ed. 2d 585; and annotation in 134 A. L. R., 1411.

We note also in passing that it has long been established that where the middle of a river or one of the shores of the river is a boundary between two states, these neighbors may establish concurrent jurisdiction over the whole river by com-

pact. Where this is done each of the states has jurisdiction from shore to shore so that the court before which the offender or the subject of legal adjudication, prosecution or trial, is first brought finally determines the case. The cases have reasoned that if the laws of both states make the same act or omission criminal, each state, in carrying out the concurrent jurisdiction, does so permissibly in the enforcement of its own laws. See Rorer, *American Interstate Law,* 2nd Ed., 438 et seq.; *State v. Cunningham* (Miss.), 59 So. 76; *State v. Federanko* (N. J.), 139 A. 2d 30; *People v. Central R. R. Co. of N. J.,* 42 N. Y. 283; *Olin v. Kitzmiller,* 259 U. S. 260, 66 L. Ed. 930; *Hendricks v. Commonwealth,* 75 Va. 934; *State v. Kurtz* (Mo.), 295 S. W. 747; *Lemore v. Commonwealth* (Ky.), 105 S. W. 930; *State v. Mullen* (Iowa), 35 Iowa 199; *State v. George* (Minn.), 63 N. W. 100; *Padgett v. State* (Ark.), 236 S. W. 603; *Means v. State* (Ark.), 176 S. W. 309; *State v. Catholic* (Ore.), 147 P. 372.

In the view we take of the case, however, we think appellants are not entitled to have a declaration as to the constitutionality of the compact in operation. They have not shown that they are engaged in or faced with actual controversy, or that the issues are ripe and justiciable, so as to be able to call upon the courts to exercise the declaratory process. *Hammond v. Lancaster,* 194 Md. 462, 471; *Hitchcock v. Kloman,* 196 Md. 351, 355; *Tanner v. McKeldin,* 202 Md. 569, *Givner v. Cohen,* 208 Md. 23, 37. Appellants do not show that the provisions of the Act of which they complain will affect any legal interests they possess or that they present immediate dangers or inevitable litigation against them except to allege that they may be tried in Virginia courts for "alleged offenses" on a Maryland river and that they will suffer "irreparable damage" by reason of the "illegal expenditure" for the expenses of administering the compact. It was held in *Hitchcock v. Kloman, supra,* that the fact a criminal penalty overhung the petitioner for declaratory relief if he acted as he claimed a right to act, would not of necessity call for a declaration as to the constitutionality of his doing what he wished to do. This Court said in *Hammond v. Lancaster,* at page 477 of 194 Md., *supra:*

"We think, however, that none of the other provisions of the Act are properly before us. The only alleged waste of public funds, except in regard to the referendum, is in the expense of enforcing and administering the Act. But we are referred to no Maryland case holding that to be a sufficient interest. On the other hand, the Supreme Court cases clearly indicate that it is beyond our power to adjudicate constitutional issues at the instance of taxpayers not directly affected. None of the complainants have been threatened with prosecution, nor do they allege any facts to indicate that they have violated, or are about to violate, any of the criminal provisions. of the Act."

The decree appealed from, to the extent that it held that Ch. 269 of the Acts of 1959 was, on its face, a constitutional enactment which was validly approved and ratified by the voters on November 8, 1960, and its dismissal of the Bill is affirmed.

*Decree affirmed, with costs.*

MARBURY, J., filed the following dissenting opinion.

With regret I find myself in disagreement with the majority opinion dealing with the adequacy or inadequacy of the publication of the text of Chapter 269 of the Acts of 1959 (the Potomac River Compact of 1958) prior to the vote taken on November 8, 1960. It has been said that the only useful purpose in filing a dissenting opinion is perhaps to underscore what the *law is not* and to point up what it *ought to be*. In this instance I am so deeply concerned with the precedent established by the majority opinion that I feel constrained to express my own views with reference to the constitutional principles here involved.

The majority hold that constitutional and statutory provisions are mandatory before an election, but that statutory provisions are directory only after the election, so that the result of the election may only be successfully contested by showing that the inadequacy of publication might reasonably

be supposed to have affected the result. They candidly concede that the publication of the text of Chapter 269 in only one of fifty-six newspapers was not in substantial compliance with Article 33, § 170, as enacted by Chapter 739 of the Acts of 1957, which was in implementation of Article XVI, § 5 (a) of the Constitution; and treat the requirement that furnishing of the text of referred laws, as required by § 170, establishes a statutory rather than a constitutional requirement. They draw a distinction between violation of a mandatory constitutional provision, *Baltimore & Drum Point RR. Co. v. Pumphrey,* 74 Md. 86, 21 Atl. 559, and violation of a mandatory statutory provision and hold that the mandatory provision of the statute before the election becomes directory only after the vote has taken place. I can not find this distinction to be valid.

The referendum article of the Constitution, Article XVI, § 1 (b), provides that "The provisions of this Article shall be self-executing; provided that additional legislation in furtherance thereof and not in conflict therewith may be enacted." Section 5 (a) of the same Article requires that "The General Assembly shall provide for furnishing the voters of the State the text of all measures to be voted upon by the people; provided, that until otherwise provided by law the same shall be published in the manner prescribed by Article XIV of the Constitution for the publication of proposed Constitutional Amendments." Article XIV, § 1 requires that a bill proposing an amendment to the Constitution shall be published by order of the Governor, in at least two newspapers, in each County, where so many may be published, and where not more than one may be published, then in that newspaper, and in three newspapers published in the City of Baltimore, once a week for four weeks immediately preceding the next ensuing general election, at which the proposed amendment shall be submitted.

As pointed out in the majority opinion, the Legislature first implemented Article XVI, § 5 by the passage of Chapter 335 of the Acts of 1941 (codified as Code, 1951, Art. 33, § 208). This required the publication of referred laws at least once in some daily newspaper of general circulation throughout the

State. This remained the law until the passage of Chapter 739 of the Acts of 1957 (now codified as Art. 33, § 170), which in substance changed the law to read substantially as provided in Article XIV, § 1 of the Constitution before any legislative enactment on the subject was passed. It is obvious that both Chapter 335 of the Acts of 1941 and Chapter 739 of the Acts of 1957 carried mandatory provisions as to the publication of referred laws, as did Article XIV, § 1 of the Constitution. They were, therefore, in conformity with Article XVI, § 1 (b), since they were in furtherance of and not in conflict with that Article. Had the Legislature, in enacting either the 1941 Act or the 1957 Act, undertaken to have substituted the directory word "may" for "shall" as provided in Article XIV, § 1, it is obvious that this attempt would have been repugnant to and in contravention of the mandatory provision of that Article of the Constitution. Since the General Assembly was powerless to pass an act which would be clearly unconstitutional, how can it be said that the courts may do this by construing the word "shall" as mandatory before the election and directory thereafter? The answer must be in the negative. The provisions of the Constitution and the laws enacted pursuant thereof are binding upon all branches of the government and the citizens of the State, and can not be disregarded by tenuous interpretation by the courts.

Since Article 33, § 170, by the express provisions of Article XVI, § 1 (b), is in *pari materia,* the former can only be construed in its literal constitutional sense. In the language of Judge Cooley, quoted in *Archer v. State,* 74 Md. 443, 448, 22 Atl. 8, in discussing mandatory and directory constitutional provisions, it is said:

> "Courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory *statutes* to the provisions of a *Constitution.* Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done; and they must be regarded in the light of limitations upon the power to be exercised. It is the province of an instrument of this solemn

and permanent character to establish those funda-
mental maxims, and fix those unvarying rules by
which all departments of government must at all
times shape their conduct. * * * We are not, there-
fore, to expect to find in a Constitution provisions
which the people in adopting it have not regarded as
of high importance, and worthy to be embraced in
an instrument which, for a time at least, is to control
alike the government and the governed, and to form
a standard by which is to be measured the power
which can be exercised as well by the delegate as by
the sovereign people themselves.  If directions are
given respecting the times or modes of proceeding
in which a power should be exercised, there is at
least a strong presumption that the people designed
it should be exercised in that time and mode only;
and we impute to the people a want of due apprecia-
tion of the purpose and proper province of such an
instrument when we infer that such directions are
given for any other end; especially, as has already
been said, it is but fair to presume that the people
in their Constitution have expressed themselves in
careful and measured terms corresponding with the
immense importance of the powers delegated, and
with a view to leave as little as possible to implica-
tion. *Cooley Const. Lim.* 78, 79."

See 16 C. J. S., *Constitutional Law*, § 61; dissenting opinion
of Judge Phelps in *State v. Long,* (Okla.), 63 P. 2d 60, 65,
a five to four decision.

The appellee's contention, which was embraced in the ma-
jority opinion, that in spite of the almost total disregard of
the statutory provision as to publication of the text of Chap-
ter 269, there is no showing that the voters were misinformed
or misled when they voted in favor of its adoption is not per-
suasive.  While it is true that much publicity was given the
fact that an election was to be held, at which the voters would
be called upon to vote upon this referred question, by means
of newspaper articles, editorials, radio and television programs,

in which the writers or speakers gave their views pro and con, this was not the mode of information envisaged in the constitutional and statutory requirements as to publishing the text of the referred law. There was much discussion through these news media, some of which dealt with only portions of the Act, some from the point of view of the proponent or opponent, with varying degrees of accuracy, which leaves the question open as to whether the electorate was fairly informed as to the subject matter of the Act.

While it may be true that the average citizen does not read the text of referred laws in his county or city paper, nevertheless a number of publicly interested citizens do read them and these, on the basis of their opportunity to familiarize themselves with the text, can materially aid in formulating public sentiment for or against proposed legislation. This was the intent of the framers of the Constitution, and undoubtedly that of the Legislature when it amended that section of the election laws in 1957. Until the Constitution, or a statute passed pursuant thereto, provides some other means for informing the people, I think the courts are not at liberty, in the enforcement of a statute, to disregard any mandate or requirement of the organic law of the State. The need for adherence to strict interpretation of the Constitution and laws of the State becomes overwhelmingly apparent where, as in this case, it is sought to submit to the voters of the State an act which would amend the compact between Virginia and Maryland, which has existed since 1785.

I would reverse the chancellor's decree because of the noncompliance with the requirement as to publication of the text of this law.